[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 18-14111
Non-Argument Calendar
_____

D.C. Docket No. 1:17-cv-00003-JRH-BKE


MALLORY C. JONES,
TROY A. MOSES,

                                                              Plaintiffs-Appellants,

versus

RAMONE LAMKIN,
Individually, and In his official capacity as Marshal of the
Civil and Magistrate Courts of Richmond County, Georgia,
AUGUSTA, GEORGIA,

                                                              Defendants-Appellees.

_____

Appeal from the United States District Court
for the Southern District of Georgia
_____

(July 16, 2019)

Before WILLIAM PRYOR, JILL PRYOR and GRANT, Circuit Judges.

PER CURIAM:

Mallory Jones and Troy Moses, both former deputy marshals of the Civil and Magistrate Courts of Richmond County, Georgia, appeal the district court's grant of summary judgment in favor of their former employer, marshal Ramone Lamkin, and Augusta, Georgia in their action raising First Amendment claims under 42 U.S.C. § 1983 and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-3(a).  Their claims stem from their termination after they supported Lamkin's opponent in the election for the position of marshal. On appeal, they argue that the court erred in granting summary judgment on their 42 U.S.C. § 1983 claims because they, as deputy marshals, were not Lamkin's alter egos.  In addition, they argue that we should reverse the grant of summary judgment on their retaliation claims.  After careful review, we affirm.

## I.    BACKGROUND

### A. Factual History

The Richmond County[1] marshal's office is a law enforcement agency in Augusta, Georgia that provides security at various public buildings in the city and

---

[1] The City of Augusta consolidated with Richmond County in 1995, and "Augusta, Georgia" ("Augusta") is the name of the consolidated government.  *See* 1997 Ga. Laws 4024. Because we conclude that no constitutional violation occurred, it is unnecessary for us to resolve whether Jones and Moses, as deputies in the county marshal's office, were employees of the consolidated government.

investigates and cites violations of certain laws and ordinances. The marshal holds an elected position and carries out his duties through deputy marshals. Directly below the marshal are the chief deputy, followed by the captain over administrative services and the captain over the airport.

Jones was employed as a deputy marshal on and off from 1993 to 2016. When Jones first was hired, the marshal for the county was Steve Smith. Smith remained the marshal and hired Jones each time he returned. When Jones was re-hired in 2003, Smith promoted him to the rank of lieutenant, and he eventually achieved the rank of captain. Jones's duties after 2003 were mostly administrative, working with the community, and doing public speaking. He also helped develop new policies and plans to grow the marshal's office and managed deputy certification.

Moses worked as a deputy marshal from 2008 to 2016. At the time of his termination, Moses was a sergeant in the marshal's office. His duties as a sergeant were community relations and public speaking, going to schools and nursing homes to teach safety classes, and attending meetings of neighborhood associations.

In 2016, Lamkin decided to run for marshal of Richmond County against the incumbent, Smith. Jones participated in Smith's campaign and posted on social media about things Smith had done for him over the years. As to Moses, Lamkin

3

asked for his support, but Moses refused because he planned to run for the position in 2020 and decided to support Smith in 2016.  Moses wore campaign shirts supporting Smith, took pictures with him to post on social media, and encouraged his family and friends to support Smith.

Lamkin won the election in May 2016 and assumed office in January 2017.  Before Lamkin assumed office, Jones was informed by Scott Peebles, the incoming chief deputy for marshal-elect Lamkin, that he was being let go from the marshal's office.  Jones later met with Lamkin, who confirmed that Jones was being terminated.  Lamkin explained in his deposition that he terminated Jones because captain of the marshal's office was a policy-making position and he had questions about Jones's suitability for it.  He said that he knew Jones had helped Smith in his re-election campaign but that it was not a factor in the decision to terminate Jones.

Peebles also informed Moses that his services would no longer be needed when Lamkin took office.  Lamkin testified in his deposition that he chose to terminate Moses because Moses planned to run for marshal in the next election, which Lamkin felt would affect the cohesiveness of the office.  He denied that Moses's support of Smith influenced his decision.

## B. Procedural History

Jones and Moses alleged in their complaint against Lamkin and Augusta that they were terminated in retaliation for supporting Smith in the election.  They

4

raised (1) First Amendment claims under § 1983 against both defendants and (2) a retaliation claim under Title VII against Lamkin.

After the close of discovery, Lamkin and Augusta separately moved for summary judgment. They both argued that even if motivated by their support of Smith, the plaintiffs' termination was permissible under the *Elrod-Branti* standard[2] because loyalty to the marshal and his policies was an appropriate requirement for effectively performing their duties. They also argued that the plaintiffs could not make out a *prima facie* retaliation claim because they could not prove a causal connection between any protected activity and their termination.

The district court granted the motions for summary judgment. First, the court addressed the plaintiffs' 42 U.S.C. § 1983 claims. It determined there was no dispute that Lamkin terminated the plaintiffs for supporting Smith. But it found that the plaintiffs, as deputy marshals, were the alter egos of the marshal when they were terminated, and thus it concluded Lamkin did not violate their First Amendment rights by terminating them. Because it determined that no constitutional violation occurred, the court declined to address whether Augusta could be liable under § 1983. As to the plaintiffs' retaliation claim, the court found

---

[2] The *Elrod-Branti* standard derives from two United States Supreme Court decisions, *Elrod v. Burns*, 427 U.S. 347 (1976), and *Branti v. Finkel*, 445 U.S. 507 (1980). *See Ezell v. Wynn*, 802 F.3d 1217, 1223 (11th Cir. 2015). As will be discussed more fully below, it is the standard by which a court determines whether adverse employment actions based on political allegiance contravene the First Amendment. *See id.* at 1223-24.

that they could not make out a *prima facie* case because political speech was not protected activity under Title VII.

Following the grant of summary judgment, the plaintiffs appealed.

## II.    STANDARD OF REVIEW

We review an order granting summary judgment *de novo*, viewing "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006). Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Shaw v. City of Selma*, 884 F.3d 1093, 1098 (11th Cir. 2018) (internal quotation marks omitted).

## III.    DISCUSSION

The plaintiffs argue that the district court erred in granting summary judgment to Lamkin and Augusta because (1) they established that their First Amendment rights were violated when Lamkin and Augusta terminated their employment based on their political support for Lamkin's rival, and (2) for their retaliation claim, they met their burden of showing that they engaged in a protected activity. We address each argument in turn.

### A. Lamkin's Termination of Jones and Moses Did Not Violate Their First Amendment Rights Because Deputy Marshals Were Alter Egos of the Marshal.

Section 1983 of Title 42 makes any person acting under color of state law liable to an injured party for depriving the injured party of his rights under the Constitution.  42 U.S.C. § 1983.

The First Amendment guarantees the right of free speech and assembly against state intrusion.  U.S. Const. amend. I; *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 277 (1964).  In general, the First Amendment protects public employees from adverse employment actions or retaliation based on their political affiliations. *Ezell v. Wynn*, 802 F.3d 1217, 1222 (11th Cir. 2015).  For public employees, the First Amendment's protections are not absolute, however.  Public employees are protected from adverse employment actions based on political patronage only when "political loyalty is an inappropriate requirement for the effectiveness of a given employee's position."  *Id.*  Whether a political patronage dismissal is permitted under the First Amendment is determined using the *Elrod-Branti* standard.  *Id.* at 1222-24.

In *Elrod*, a plurality decision, the controlling concurring opinion held that "a nonpolicymaking, nonconfidential government employee can[not] be discharged or threatened with discharge from a job that he is satisfactorily performing upon the sole ground of his political beliefs."  427 U.S. at 375 (Stewart, J., concurring) (plurality opinion); *see Marks v. United States*, 430 U.S. 188, 193 (1977) (stating that the opinion concurring on the narrowest ground may be regarded as the

7

controlling opinion of a plurality decision).  In *Branti*, the Court clarified that "the ultimate inquiry is not whether the label 'policymaker' or 'confidential' fits a particular position [but whether] the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  445 U.S. at 518.  This latter statement is the *Elrod-Branti* standard.  *Ezell*, 802 F.3d at 1223.

To determine whether the *Elrod-Branti* standard is met, we use a "categorical approach" to determine whether the employee has the same statutory powers and duties as the elected official.  *Id.* at 1225.  In applying the categorical approach, we look only at what the employee was empowered to do under state or local law, not the actual daily activities of the employee.  *Id.*  If the employee had the same duties and powers as the elected official, she was the elected official's "alter ego," and her termination based on her political affiliation did not violate the First Amendment.  *Id.*; *see Underwood v. Harkins*, 698 F.3d 1335, 1345 (11th Cir. 2012) (holding that a Georgia superior court clerk did not violate the First Amendment when she discharged a deputy superior court clerk for running against her; the deputy was her alter ego because the Georgia legislature gave persons holding the position of deputy superior court clerk the same powers and duties as the superior court clerk).  If not, then we determine whether, as a factual matter,

8

the effectiveness of the employee's position required political loyalty.  *Ezell*, 802 F.3d at 1224-25.

In *Ezell*, we applied the categorical approach and concluded that a deputy sheriff was the alter ego of the sheriff under Georgia law.  *Id.* at 1225-26.  In reaching this conclusion, we relied on state court precedent holding that deputy sheriffs were the sheriff's agents and state law granting sheriffs the authority to appoint deputies at their discretion.  *See id.*

We now examine the position of marshal and deputy marshal under Georgia law.  We begin with the history of the positions' creation.  The Municipal Court of Augusta was established by the Georgia General Assembly in 1931; along with it, the elected position of sheriff was created.  1931 Ga. Laws 270, 270-72.  The law was amended in 1971 to replace that court with the Civil Court of Richmond County.  1971 Ga. Laws 2745, 2746.  The position of sheriff was changed to an appointed one, but, with the chief judge's approval, the sheriff could name deputies who would serve at his pleasure.  *Id.* at 2751.  The deputies would have the same duties and responsibilities as the sheriff.  *Id.* at 2751-52.

The law was amended again in 1974, *see* 1974 Ga. Laws 2410, 2416-17, and the relevant amended language provides that:  "The sheriff . . . shall have authority . . . to name [his] deputies who shall hold said office at the pleasure of the said sheriff."  *Id.* at 2416.  "[D]eputy sheriffs, if and when appointed under the terms of

9

this Act, shall exercise *all the functions* and be subject to *all the responsibilities and requirements* of the . . . sheriff of said court." *Id.* at 2417 (emphasis added). In 1978, the Georgia General Assembly replaced the word "sheriff," as it relates to the Civil Court of Richmond County, with "marshal." 1978 Ga. Laws 3341. Thereafter, the sheriff of the Civil Court of Richmond County was known as the marshal of that court. *Id.* In 1999, the marshal was made an elected position, with the authority to appoint deputies "who shall hold said office at the pleasure of the marshal." 1999 Ga. Laws 3508, 3508-09.

Applying the categorical approach here, we conclude that under Georgia law a deputy marshal in Richmond County has the same powers and duties of the marshal and, therefore, is his alter ego. *See Ezell*, 802 F.3d at 1225. As with the clerk and deputy clerks in *Underwood*, the relevant state law here gave deputy marshals the same powers and duties as the marshal. *See* 1974 Ga. Laws at 2417; 1978 Ga. Laws at 3341; *Underwood*, 698 F.3d at 1345. And, like the position of sheriff we considered in *Ezell*, the marshal had the discretion to appoint and remove deputies. *See* 1999 Ga. Laws at 3508-09; *Ezell*, 802 F.3d at 1225-26. Because as deputy marshals the plaintiffs had the same powers and duties as the marshal and because the marshal had the discretion to appoint and remove them, they were his alter egos. *See Ezell*, 802 F.3d at 1225. Thus, Lamkin was permitted

10

to terminate their employment based on a political reason, their support of his opponent in the election.  *See id.*

The plaintiffs argue at length on appeal that the district court erred in concluding that deputy marshals were the alter egos of the marshal because the marshal and the sheriff were not the same office.  Their argument is misplaced, however, because the district court's conclusion that the deputy marshal was the alter ego of the marshal was not based on a determination that the marshal was equal to the sheriff.  Rather, it was based on a correct determination that Georgia's state laws gave the deputy marshal the same powers and duties as the marshal.

The plaintiffs also contend that the district court erred in applying the categorical approach and, instead, should have considered the actual duties that Jones and Moses performed.  They base this contention in part on the premise that the district court erroneously found that the marshal was the equivalent of the sheriff.  As noted, however, the district court never made such a finding.

Relatedly, the plaintiffs assert that O.C.G.A. § 15-10-100(c.1)(2) prohibits marshals from exercising powers vested in sheriffs.  They contend that the 1978 and 1999 laws defining the powers of deputy marshals violated § 15-10-100(c.1)(2) because those laws were derived from the 1974 laws defining the powers of sheriffs.  Because the 1978 and 1999 laws were invalid, the plaintiffs argue, the court could not rely on them to apply the categorical approach.  But the

11

plaintiffs' argument is unavailing because § 15-10-100 expressly permits marshals to exercise powers vested in the sheriff if the law provides for it:

> No person employed or appointed as a marshal . . . shall exercise any of the powers or authority which are by law vested in the office of sheriff or any other peace officer, including the power of arrest, *except as may be authorized by law*.

O.C.G.A. § 15-10-100(c.1)(2) (emphasis added).

Jones and Moses also rely on local ordinances and municipal employment policies to establish that they could not be terminated based on their political activities. These policies say nothing, however, about the factors relevant to our inquiry—the powers and duties of the marshal and his deputies. They therefore have no bearing on whether the plaintiffs' termination violated their First Amendment rights or whether the categorical approach applied in this case. *See Ezell*, 802 F.3d at 1224-25.

Because Jones and Moses have failed to show that their termination violated their First Amendment rights, we affirm the district court's grant of summary judgment as to their § 1983 claims.

## B. The District Court Did Not Err in Granting Summary Judgment on the Plaintiffs' Retaliation Claims.

On appeal, Jones and Moses contend that the district court erred in granting summary judgment on their retaliation claims because they were terminated for engaging in protected activity. As we concluded above, the plaintiffs' termination

12

did not violate their First Amendment rights, so we affirm the grant of summary judgment on their retaliation claims to the extent they brought those claims under 42 U.S.C. § 1983.  We turn next to the plaintiffs' Title VII retaliation claims.

Title VII makes it unlawful for an employer to discharge an employee on the basis of the employee's "race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  Title VII's retaliation provision makes it unlawful for an employer to retaliate against an employee because the employee "has opposed any practice made an unlawful employment practice by this subchapter" or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  A plaintiff may establish a *prima facie* retaliation claim by showing that (1) he was engaged in statutorily protected activity, (2) he suffered a materially adverse action, and (3) there was a causal connection between the two events.  *Goldsmith v. Bagby Elevator Co., Inc.*, 513 F.3d 1261, 1277 (11th Cir. 2008).

The district court was correct to conclude that the plaintiffs failed to establish a *prima facie* Title VII retaliation claim; they failed to come forward with any evidence that they were terminated for opposing any employment practice made unlawful by Title VII or for participating in any investigation, hearing, or proceeding.  *See* 42 U.S.C. § 2000e-3(a); *Goldsmith*, 513 F.3d at 1277.  Moreover, the plaintiffs have not expressly challenged that conclusion on appeal.

13

## IV.    CONCLUSION

Because Jones and Moses have failed to show that the district court erred,

the grant of summary judgment is affirmed.

**AFFIRMED.**