NOTICE

Decision filed 09/13/07. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

NO. 5-06-0344

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | |
|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) St. Clair County. |
| | ) |
| v. | ) No. 03-CF-84 |
| | ) |
| CHAD MONTGOMERY, | ) Honorable |
| | ) Milton S. Wharton, |
| Defendant-Appellee. | ) Judge, presiding. |

_____

JUSTICE WEXSTTEN delivered the opinion of the court:

The State appeals from the circuit court's order granting the defendant's motion to suppress statements. For the reasons that follow, we affirm.

BACKGROUND

In 2003, the defendant, an 18-year-old resident of Arnold, Missouri, was charged with burglarizing a locksmith business located in Cahokia, Illinois. The defendant later moved to suppress inculpatory statements that he had made to officers from the Arnold police department and the Cahokia police department. In 2005, at a hearing on the defendant's motion to suppress, the following evidence was adduced.

In January 2003, the defendant lived with his parents at their home in Arnold, Missouri. As a local firefighter, the defendant's father, Lloyd Montgomery, was acquainted with many of the local police. On the evening of January 21, 2003, acting on information implicating the defendant in a series of thefts and burglaries, Officer Gerald Abernathy of the Arnold police department contacted Lloyd and advised him that he wanted to search the defendant's room for stolen property. At approximately 9 p.m., Lloyd consented to the

1

search, and numerous items of stolen property were subsequently found and seized. The defendant, who was present during the search, was then transported to the Arnold police department, where he gave a series of incriminating statements. The recovered stolen property ultimately led to the solving of more than 90 crimes, all of which occurred in Missouri with the exception of the Cahokia burglary.

Officer Abernathy testified that the defendant was read his *Miranda* rights (*Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966)) in Lloyd's presence while Lloyd was filling out a consent-to-search form. Abernathy indicated that Lieutenant Wieland of the Arnold police department was also present. Abernathy did not testify that the defendant waived or indicated that he understood his *Miranda* rights after they were read to him, and although available, Lieutenant Wieland was not called to testify. Abernathy stated that the defendant was cooperative during the search and agreed to go to the police station for questioning. Abernathy acknowledged that the defendant was not given a choice on where the questioning would occur. Abernathy stated that the defendant was placed in an interview room at the station while the recovered stolen property was being unloaded and that the room's door was left partially open. Had the door been shut, he explained, the defendant would not have been able to open it from inside the room. The subsequent interview occurred in the same room and was videotaped. Abernathy initially testified that the defendant read and signed a *Miranda* waiver form at the beginning of the interview but later acknowledged that he and Detective Robert Streckfuss had interviewed the defendant for several hours before giving him a *Miranda* waiver form to read and sign. Prior to reading and signing the waiver, the defendant confessed to numerous thefts and burglaries, "made a statement that he had broken into a locksmith business in Illinois," and described the location of the business. At around 2 a.m. on January 22, the defendant read and signed a *Miranda* waiver form and began writing a statement recounting what he had already

2

admitted. The defendant completed the written statement at 3:20 a.m. and was formally arrested and booked shortly before 4 a.m. Breaks were taken during the course of the interview.

Detective Robert Streckfuss of the Arnold police department testified that he was a detective on January 21, 2003, and that he transported the defendant from the defendant's house to the police station. The defendant was then placed in an interview room while he and Officer Abernathy unloaded the recovered stolen property. Streckfuss indicated that the interview room's door was shut while the property was being unloaded, but he stated that the defendant would have been able to open the door from inside the room. Streckfuss testified that when later questioned, the defendant was not initially given the *Miranda* warnings because they were conducting an "informal interview" and because he was under the impression that Abernathy had previously advised the defendant of his rights at the house. Streckfuss did not indicate that he was also under the impression that the defendant had acknowledged or waived his rights at the house, nor did he indicate that he was under the impression that the defendant had agreed to give a statement. Streckfuss stated that the defendant had been interviewed for two to three hours before he was given a *Miranda* waiver form. Streckfuss recalled that the defendant initially denied committing any crime, but Streckfuss did not recall telling the defendant that "the rules were going to change" if he persisted in his denials. The defendant signed the *Miranda* waiver form before writing his "formal statement." Streckfuss acknowledged that they "waited" to give the defendant a *Miranda* waiver form "until after he confessed to everything," including the Cahokia burglary. Streckfuss estimated that including the "several breaks" that were taken, the entire interview process lasted approximately 4½ hours. Following the defendant's arrest at approximately 4 a.m., the defendant was placed in a jail cell, and Streckfuss contacted the Cahokia police department. A dispatcher with the Cahokia police department advised

3

Streckfuss that someone would get back to him. Streckfuss acknowledged that he advised the defendant to cooperate with the Cahokia police.

Detective David Landmann of the Cahokia police department testified that he contacted Detective Streckfuss shortly after 8 a.m. on January 22. Streckfuss explained that the defendant was in custody and had confessed to burglarizing a locksmith business in Cahokia. Landmann was familiar with the crime and proceeded to the Arnold police department. Shortly before 11 a.m., Landmann read the defendant his *Miranda* rights in the interview room and gave him a *Miranda* waiver form. The defendant signed the form before providing Landmann with a written statement regarding the Cahokia burglary. Officer Abernathy was present while Landmann interviewed the defendant. Landmann acknowledged that prior to commencing an interview with a suspect "in custody," he always administers the *Miranda* warnings and obtains the suspect's signature on a *Miranda* waiver form.

Lloyd Montgomery testified that when he signed the consent-to-search form, Officer Abernathy, Lieutenant Wieland, and the defendant were present but that Abernathy did not advise the defendant of his *Miranda* rights. After the search was complete, the officers told the defendant that he "had to go down to the station to answer questions." Lloyd asked if he could accompany the defendant but was told that he could not and would have to come down to the station the following morning.

The defendant testified that before January 21, 2003, he had never had any contact with the police and had never "been in trouble." The defendant stated that following the search of his house, he was told that he had to go to the Arnold police department to answer questions and was given no choice in the matter. The defendant stated that he was placed in an interview room, the door was closed, and he was unable to open the door when he attempted to do so. The defendant stated that his attempt to open the door could be seen on

4

the videotape of the initial interview. Around 11 p.m., Abernathy and Streckfuss entered the room and began questioning him. He was not advised of his *Miranda* rights at the time and was not familiar with the rights. The defendant testified that when he denied committing the crimes in question, the officers became angry and told him that they were "going to have to change the rules" if he was not going to be honest with them. The defendant eventually agreed to tell them everything, and his confession included admitting his involvement in the Cahokia burglary. Around 2 a.m., the defendant read and signed a *Miranda* waiver form, but prior thereto, he had neither been advised of nor waived his *Miranda* rights. The defendant further stated, "[B]y then[,] I had told them everything that I had done." Streckfuss later told the defendant that he should tell the Cahokia police the truth. At 4 a.m. the defendant went to sleep, but he was awakened three hours later so that he could be interviewed by investigators from St. Louis County. His interview with the St. Louis County investigators lasted several hours. He was then interviewed by the Cahokia police.

At the hearing, defense counsel contended that the defendant's statements should be suppressed because the Arnold police delayed administering the *Miranda* warnings until after the defendant had confessed. At the same time, defense counsel twice stated that the defendant was not alleging any wrongdoing on the part of the Cahokia police. When granting the defendant's motion to suppress the statements that he had made to both the Arnold police and the Cahokia police, the circuit court concluded that the statements had been obtained in violation of *Miranda v. Arizona*, 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602 (1966). Referring to Officer Abernathy's inability to "recall clearly," Lieutenant Wieland's failure to testify, and Lloyd's unimpeached testimony, the court indicated that it was resolving the dispute regarding whether the defendant had been read his *Miranda* rights at his home in favor of the defendant. The court also noted that the defendant had been questioned for several hours before *Miranda* warnings were given and that the warnings were

5

given only "after he had agreed to make a formal statement." The court further determined that the subsequent interview by the Cahokia police "was directly associated and related to the first interrogation" and that the two could not "be segregated." Lastly, finding that the defendant's statements had not been obtained by "force, mistreatment, or coercion," the court ruled that they could be used for impeachment purposes pursuant to *Harris v. New York*, 401 U.S. 222, 28 L. Ed. 2d 1, 91 S. Ct. 643 (1971). The State filed a timely notice of appeal.

STANDARD OF REVIEW

When reviewing a circuit court's ruling on a motion to suppress evidence, great deference is accorded the court's factual findings, and those findings will be reversed only if they are against the manifest weight of the evidence; ultimate questions of law, however, are reviewed *de novo*. *People v. Sutherland*, 223 Ill. 2d 187, 196-97 (2006). "A factual finding is against the manifest weight of the evidence when the opposite conclusion is clearly evident or the finding is arbitrary, unreasonable, or not based in evidence." *Samour, Inc. v. Board of Election Commissioners of the City of Chicago*, 224 Ill. 2d 530, 544 (2007).

ANALYSIS

The rule of *Miranda v. Arizona*, 384 U.S. 436, 467-79, 16 L. Ed. 2d 694, 719-27, 86 S. Ct. 1602, 1624-30 (1966), requires the suppression of statements made by a defendant in response to custodial police interrogation unless preceded by a statement of basic constitutional rights, including the right to remain silent, and a waiver of those rights. *People v. Peterson*, 372 Ill. App. 3d 1010, 1018 (2007). In *Oregon v. Elstad*, 470 U.S. 298, 309-18, 84 L. Ed. 2d 222, 232-38, 105 S. Ct. 1285, 1293-98 (1985), however, the Supreme Court held that where an initial statement is "technically" obtained in violation of *Miranda* and thus rendered inadmissible, a subsequent statement obtained in compliance with *Miranda* is not *per se* inadmissible "absent deliberately coercive or improper tactics in obtaining the initial statement." The *Elstad* Court reasoned that it would be "an unwarranted extension of

6

*Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Elstad*, 470 U.S. at 309, 84 L. Ed. 2d at 232, 105 S. Ct. at 1293. The *Elstad* Court explained that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement" and that the "relevant inquiry" in those instances is whether the statements were voluntarily made. *Elstad*, 470 U.S. at 314-18, 84 L. Ed. 2d at 235-38, 105 S. Ct. at 1296-98. The defendant in *Elstad* made an unwarned inculpatory admission in response to a comment made by an officer who was taking him in for questioning, the defendant later gave a full written confession after receiving and waiving his *Miranda* rights, and the trial court suppressed the initial admission but allowed the introduction of the written statement into evidence. *Elstad*, 470 U.S. at 301-02, 84 L. Ed. 2d at 227-28, 105 S. Ct. at 1288-89. Determining that the trial court had properly ruled, the *Elstad* Court summarized its holding as follows: "[A] suspect who has once responded to unwarned yet uncoercive questioning is not thereby disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings." *Elstad*, 470 U.S. at 318, 84 L. Ed. 2d at 238, 105 S. Ct. at 1298.

In *Missouri v. Seibert*, 542 U.S. 600, 604-17, 159 L. Ed. 2d 643, 650-58, 124 S. Ct. 2601, 2605-13 (2004) (plurality opinion of Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ.), a plurality of the Supreme Court held that when *Miranda* warnings are administered in the midst of an interrogation rather than at its commencement, the relevant inquiry is whether it would be reasonable to conclude that, under the circumstances, the warnings effectively advised the suspect of his right to remain silent. In *Seibert*, the

7

statements at issue had been obtained by the deliberate use of a two-stage or "question first and warn later" technique, *i.e.*, the *Miranda* warnings were strategically withheld until after the defendant had confessed, and then after a waiver of the *Miranda* rights had been obtained, the defendant was questioned again. *Seibert*, 542 U.S. at 604-11, 159 L. Ed. 2d at 650-54, 124 S. Ct. at 2606-10. The *Seibert* plurality reasoned that the employment of that technique frustrated *Miranda*: "[I]t is likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Seibert*, 542 U.S. at 613, 159 L. Ed. 2d at 655, 124 S. Ct. at 2610. The plurality observed, "Upon hearing warnings only in the aftermath of interrogation and just after making a confession, a suspect would hardly think he had a genuine right to remain silent, let alone persist in so believing once the police began to lead him over the same ground again." *Seibert*, 542 U.S. at 613, 159 L. Ed. 2d at 655-56, 124 S. Ct. at 2611. Rejecting the State's argument that confessions obtained by use of a two-step interrogation strategy are admissible under the authority of *Elstad*, the plurality noted that in *Elstad*, the initial failure to administer the *Miranda* warnings was inadvertent, the defendant's initial inculpatory statement was made during a brief encounter in his living room which was not intended to be an interrogation, and the questioning that later occurred at the police station presented a "markedly different experience from the short conversation at home." *Seibert*, 542 U.S. at 614-15, 159 L. Ed. 2d at 656-57, 124 S. Ct. at 2611-12. Thus, in *Elstad*, "the *Miranda* warnings could have made sense as presenting a genuine choice whether to follow up on the earlier admission." *Seibert*, 542 U.S. at 615-16, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612. The plurality concluded that "a series of relevant facts *** bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation,

8

the overlapping content of the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Seibert*, 542 U.S. at 615, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612. Applying that analysis to the situation before it, the plurality found that the statements at issue were properly suppressed. *Seibert*, 542 U.S. at 616-17, 159 L. Ed. 2d at 657-58, 124 S. Ct. at 2612-13.

Concurring in the judgment, Justice Kennedy narrowed the approach taken by the *Seibert* plurality. *Seibert*, 542 U.S. at 618-22, 159 L. Ed. 2d at 659-62, 124 S. Ct. at 2614-16 (Kennedy, J., concurring). Justice Kennedy noted that the plurality's multifactor test to determine the effectiveness of warnings delivered in the midst of an interrogation "applies in the case of both intentional and unintentional two-stage interrogations," and Justice Kennedy concluded that "this test cuts too broadly." *Seibert*, 542 U.S. at 621-22, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Justice Kennedy wrote: "The admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed. If the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Such "curative measures" might include allowing "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning" and giving "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661, 124 S. Ct. at 2616 (Kennedy, J., concurring). Because in *Seibert* a question-first/warn-later strategy was deliberately used and no curative measures were taken, Justice Kennedy concurred in the plurality's judgment. *Seibert*, 542 U.S. at 622, 159 L. Ed. 2d at 661-62, 124

9

S. Ct. at 2616 (Kennedy, J., concurring).

In the absence of a majority opinion, a holding of the Supreme Court is generally considered the position taken by the members who concurred on the narrowest grounds. *Marks v. United States*, 430 U.S. 188, 193, 51 L. Ed. 2d 260, 266, 97 S. Ct. 990, 993 (1977). In *United States v. Williams*, 435 F.3d 1148, 1157 (9th Cir. 2006), the court applied the *Marks* rule to *Seibert* and held, "[A] trial court must suppress postwarning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning–in light of the objective facts and circumstances–did not effectively apprise the suspect of his rights." The *Williams* court then noted, "In situations where the two-step strategy was not deliberately employed, *Elstad* continues to govern the admissibility of postwarning statements." *Williams*, 435 F.3d at 1158; accord *United States v. Stewart*, 388 F.3d 1079, 1090 (7th Cir. 2004). Agreeing with the *Seibert* plurality's observation that the true intent of an officer will rarely be candidly admitted, the *Williams* court further held, "[I]n determining whether the interrogator deliberately withheld the *Miranda* warning, courts should consider whether objective evidence and any available subjective evidence, such as an officer's testimony, support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning." *Williams*, 435 F.3d at 1158. Again merging the analyses of the *Seibert* plurality and Justice Kennedy's concurrence, the *Williams* court directed that in determining the effectiveness of a midstream *Miranda* warning, courts should consider the following: "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first[,] and (6) whether any curative measures were taken." *Williams*, 435 F.3d at 1160.

In the present case, the State argues that we should reverse the circuit court's

suppression order under the principles enunciated in *Elstad* because there is no indication that the Arnold police deliberately employed a two-step interrogation technique when questioning the defendant. The defendant responds that *Seibert* should apply because the record supports a finding that the police deliberately withheld the *Miranda* warnings until after he confessed. We agree with the defendant. We further believe that *Williams* sets forth a well-reasoned approach to the resolution of the controversy. But see *United States v. Carrizales-Toledo*, 454 F.3d 1142, 1151 (10th Cir. 2006) (suggesting in *dicta* that, the *Marks* rule notwithstanding, the plurality opinion might represent the controlling holding of *Seibert*); *Martinez v. State*, 204 S.W.3d 914, 918-20 (Tex. App. 2006) (holding that, the *Marks* rule notwithstanding, "the plurality opinion [in *Seibert*] is more persuasive and therefore governs").

Here, the circuit court found that the defendant had been questioned for several hours before *Miranda* warnings were given and that the warnings were given only "after he had agreed to make a formal statement." The court determined that the defendant had not been given the *Miranda* warnings at his home prior to the search, and the record supports an inference that Officer Abernathy and Detective Streckfuss deliberately employed a two-step interrogation technique when obtaining the defendant's confessions. *Cf. People v. Lopez*, 367 Ill. App. 3d 817, 825 (2006) (rejecting the defendant's *Seibert* claim on the ground that there was "no evidence" that the *Miranda* warnings were withheld until after a confession had been secured); *Williams*, 435 F.3d at 1161 (remanding where the reviewing court was "unable to determine on the record" whether the interrogators purposefully delayed giving the *Miranda* warnings until after a confession had been secured). We find most significant Streckfuss's acknowledgment that they "waited" to give the defendant a *Miranda* waiver form "until after he confessed to everything," including the Cahokia burglary. As stated in *Williams*: "Once a law enforcement officer has detained a suspect *and subjects him to interrogation*–as was

11

the case in *Seibert* and is the case here–there is rarely, if ever, a legitimate reason to delay giving a *Miranda* warning until after the suspect has confessed. Instead, the most plausible reason for the delay is an *illegitimate* one, which is the interrogator's desire to weaken the warning's effectiveness." (Emphasis in original.) *Williams*, 435 F.3d at 1159. Streckfuss also characterized the lengthy prewarned portion of the initial interview as an "informal interview," suggesting that the *Miranda* warnings were being withheld until the commencement of the *formal* one. In an apparent attempt to justify their failure to provide the defendant with a *Miranda* waiver form at the beginning of the interview, the officers suggested that the defendant had been read the *Miranda* warnings at his home prior to the search, but the defendant and his father both denied that was the case, and the trial court resolved the issue in the defendant's favor. Moreover, assuming, *arguendo*, that the defendant had been read the *Miranda* warnings at his home prior to the search, neither officer testified that the defendant waived or even acknowledged receiving his rights at any time before the interview commenced.

Having concluded that the evidence supports an inference that the Arnold police deliberately withheld the *Miranda* warnings until after the defendant confessed, we next determine whether the *Miranda* warnings administered by the Arnold police and later by the Cahokia police were effective considering the six aforementioned factors, *i.e.*, "(1) the completeness and detail of the prewarning interrogation, (2) the overlapping content of the two rounds of interrogation, (3) the timing and circumstances of both interrogations, (4) the continuity of police personnel, (5) the extent to which the interrogator's questions treated the second round of interrogation as continuous with the first[,] and (6) whether any curative measures were taken" (*Williams*, 435 F.3d at 1160). This determination requires us to view the "objective evidence" and ask whether the administered warnings "adequately and effectively apprised the suspect that he had a 'genuine choice whether to follow up on [his]

12

earlier admission.' " *Williams*, 435 F.3d at 1160 (quoting *Seibert*, 542 U.S. at 616, 159 L. Ed. 2d at 657, 124 S. Ct. at 2612).

In the present case, the defendant was given the first *Miranda* waiver form when he agreed to make a written statement after several hours of interrogation, but as described by the defendant "by then[,] [he] had told them everything that [he] had done," including the Cahokia burglary. When the defendant was later given a *Miranda* waiver form by Detective Landmann, he had already confessed to the Cahokia burglary both orally and in writing. All questioning occurred in the same room and, although breaks of varying lengths of time were taken, during the same 12-hour period. Streckfuss and Abernathy were both present throughout the initial rounds of questioning, and Abernathy was present when the defendant was later interviewed by Landmann. Although Streckfuss was not present when the defendant was questioned by Landmann, Streckfuss had previously advised the defendant to cooperate with the Cahokia police. The defendant was also awakened from his sleep so that he could be interviewed by investigators from St. Louis County before being questioned by Landmann. There was never a substantial break in time or a meaningful change in circumstances that might constitute a curative measure, and as the circuit court found, the interview by the Cahokia police "was directly associated and related to the first interrogation" to the extent that the two could not "be segregated." The defendant was never advised that his prewarned admissions would be inadmissible in the State's case in chief. Under the circumstances, it would have been reasonable for the defendant to regard all the interrogations "as parts of a continuum, in which it would have been unnatural to refuse to repeat at the [later] stage[s] what had been said before." *Seibert*, 542 U.S. at 617, 159 L. Ed. 2d at 658, 124 S. Ct. at 2613. We therefore conclude that the *Miranda* warnings administered by the Arnold police and the Cahokia police were ineffective under *Seibert*, and accordingly, we affirm the circuit court's order granting the defendant's motion to suppress.

CONCLUSION

The record reveals that the present case should be governed by *Seibert* rather than *Elstad* and that the defendant's statements were rightfully suppressed. We therefore affirm the judgment of the circuit court of St. Clair County.


Affirmed.


SPOMER and STEWART, JJ., concur.

NO. 5-06-0344

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellant, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 03-CF-84 |
| | ) | |
| CHAD MONTGOMERY, | ) | Honorable |
| | ) | Milton S. Wharton, |
| Defendant-Appellee. | ) | Judge, presiding. |

_____

**Opinion Filed**:      September 13, 2007

_____

**Justices**:      Honorable James M. Wexstten, J.

Honorable Stephen L. Spomer, J., and
Honorable Bruce D. Stewart, J.,
Concur

_____

**Attorneys for Appellant**      Norbert J. Goetten, Director, Stephen E. Norris, Deputy Director, Rebecca E. McCormick, Staff Attorney, Office of the State's Attorneys Appellate Prosecutor, 730 E. Illinois Highway 15, Suite 2, P.O. Box 2249, Mt. Vernon, IL 62864; Hon. Robert Haida, State's Attorney, St. Clair County, 10 Public Square, Belleville, IL 62220

_____

**Attorney for Appellee**      P. Richard Sturgeon
23 South First Street
Belleville, IL 62220

_____